# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7830 | **DATE** | 12/1/2003 |
| **CASE TITLE** | Lisa Hausz vs. Sunrise Chevrolet, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: In sum, because Hausz has failed to provide sufficient evidence from which a reasonable fact finder could conclude that she was subjected to retaliation for her lawsuit, we hold that defendants are entitled to summary judgment on Hausz's retaliation claim. Defendants' motion to strike (26-1) is denied and defendants' motion for summary judgment (18-1) is granted. The status hearing set for 12/18/03 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | DEC 0 1 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | 30 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 12/1/2003 | |
| GL | courtroom deputy's initials | 03 DEC -2 AM 2: 57 FILED.10 | Date/time received in central Clerk's Office | date mailed notice | |
| | | | | GL mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LISA HAUSZ,                          )
                                     )
      Plaintiff,            )
                                     )
      v.                    )    Case No. 02 C 7830
                                     )
SUNRISE CHEVROLET, INC.,             )
GARBER MANAGEMENT GROUP,             )
                                     )
      Defendants.           )
                                     )



## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

      Plaintiff Lisa Hausz ("Hausz") filed a three-count amended complaint against Defendants, Sunrise Chevrolet, Inc. ("Sunrise") and Garber Management Group ("GMG") alleging they violated Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by paying her less than her male counterparts, failing to promote her, retaliating against her for filing a complaint with the Equal Employment Opportunity Commission, and constructively discharging her. Hausz also brought a claim under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), alleging Defendants paid her less than her male counterparts. Defendants moved to strike portions of Hausz's response to its Local Rule 56.1(a) Statement of Facts. Defendants also moved for summary judgment. For the reasons stated below, we deny Defendants' motion to strike and grant Defendants' motion for summary judgment.

## I.    MOTION TO STRIKE

      Before we can reach the merits of Defendants' motion for summary judgment, we must address their motion to strike. Defendants object to Hausz's response to paragraph 38 of Defendants' Local Rule

56.1 Statement. On a motion for summary judgment, the moving party shall file a statement of material facts which "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials. . ." L.R. 56.1(a). In ¶ 37 of Defendants' Local Rule 56.1 Statement, they list thirty-six duties sales managers at Sunrise allegedly perform. Hausz objected to the paragraph as failing to comply with L.R. 56.1. Hausz also disputed the paragraph with a citation to the record and provided additional facts in support of her denial. In ¶ 38, Defendants then asserted that Hausz, in her capacity as BDC Manager, had few of the duties listed in ¶ 37. In response to ¶ 38, Hausz included a five-page, four-column chart comparing the purported duties of sales managers listed in ¶ 37 with Hausz's assertions of her duties as BDC Manager and later, sales manager. Defendants argue Hausz's response fails to comply with the requirement that nonmovant file a similarly structured, concise response to the movant's statement. L.R. 56.1(b)(3)(A).[1] We agree. Both parties, however, failed to keep their paragraphs short. Indeed, Hausz's chart was submitted in response to one long paragraph that lumped over thirty duties together. Nonetheless, because we are able to follow their respective contentions, we find it unnecessary to strike either paragraph. Moreover, to the extent any assertion has been inadequately or improperly supported or contains legal conclusions or arguments, the assertion will not be incorporated into the facts taken as true for purposes of this motion for summary judgment.

## II.    BACKGROUND[2]

GMG hired Hausz as an internal consultant in June, 1999. GMG provides management and consulting services to car dealerships, including Sunrise, a Chevrolet dealership that sells new and used

---

[1] Hausz also uses this same chart in her Statement of Additional Facts filed in accordance with Local Rule 56.1(b)(3)(B).

[2] The following facts, unless otherwise noted, are culled from the properly pled portions of the parties' Local Rule 56.1 Statements of Material Facts and accompanying exhibits.

cars. Sunrise has approximately 120 employees. Hausz has a bachelor's degree in economics and management and an MBA in strategy and marketing. Prior to starting at GMG and while she was still attending school, Hausz worked for a few months part-time at a used car dealership performing a range of tasks. In January, 2001, Hausz was hired by Sunrise to work on special projects for Sunrise's General Manager, Scott Ellsworth, at a starting salary of $69,000. By March of 2001, Hausz was named marketing director. In the latter half of 2001, Hausz requested an alternative means for increasing her salary. Ellsworth discussed the possibility of a sales manager position with Hausz but she declined the position because she did not want to work weekends and evenings, as required by the position. According to Hausz, in 2001, she expressed interest in a finance position to Ellsworth.

In July, 2001, Sunrise transformed its Customer Development Center into a Business Development Center ("BDC") in order to increase sales and customer satisfaction for the store. In January, 2002, Ellsworth was named Chief Operating Officer ("COO") of GMG, and Pat O'Brien became the General Manager of Sunrise. That same month, Hausz was offered and accepted the position of BDC Manager. As part of her new position, O'Brien offered Hausz a new pay plan. The new pay plan provided Hausz with a commission of 12.5% of the variable managers' compensation pool. The variable managers' compensation pool is 15% of the sales department's gross profits, which is then divided up by percentage among those who are considered variable managers. At Sunrise, variable managers are responsible for automobile sales. As BDC Manager, Hausz was considered a variable manager. Hausz agreed to the new pay plan because there was the potential to "make a lot in commissions" if the sales department had substantial profits. (Def. L.R. 56.1 ¶ 31).

As BDC Manager, Hausz's primary responsibilities included fielding incoming phone calls, scheduling customer appointments, training employees on phone call procedures and supervising employees who rotated into the BDC to take phone calls. Hausz was physically located in the BDC

3

room, which was situated at the center of the dealership. Hausz interacted with customers over the telephone, but had little face-to-face customer contact. Hausz had a different schedule than any other variable manager. She set her own hours, subject to the approval of the General Manager. As BDC Manager, Hausz was not primarily responsible for appraisals, acquisitions, or the reconditioning of vehicles. She also was not responsible for negotiating, pricing, or closing deals face-to-face with customers. Within the BDC department, Hausz directly supervised two employees.

In June 2002, Dan Kurtz became the General Manager of Sunrise. Kurtz hired Dennis Onorato as a secondary finance manager in July 2002, and did not discuss this position with Hausz. Throughout the summer of 2002, Kurtz and Finance Director, Odis Horne, were developing a new position in the finance department. Kurtz approached Hausz with an offer of a position of assistant in the finance department, which Hausz refused as too administrative. Sometime in September 2002, Kurtz expressed interest in merging the BDC, which Hausz managed, and the Internet Department, which Chris Lucarelli managed. Hausz and Lucarelli proposed a plan to create a new hybrid department with both Hausz and Lucarelli serving as co-managers. They also submitted a new pay plan. Sunrise rejected the proposal as unnecessary and did not implement the proposed compensation plan. Instead, Sunrise considered both Hausz and Lucarelli to manage the merged department ("hybrid department") and chose Hausz as the new manager of the hybrid department.

As manager of the hybrid department, Hausz supervised a total of six employees, four of whom were considered salespersons. According to Hausz, when she asked about a new pay plan, Kurtz told her that her percentage in the compensation pool was not considered in the same manner as other managers receiving commissions from the pool because her 12.5% was "outside the entire pool." (Pl. L.R. 56.1 ¶ 193). Hausz testified at her deposition that Ellsworth informed her she had to "prove herself" before receiving a new pay plan. (Pl. L.R. 56.1 ¶ 195). Hausz contends that neither Ellsworth

nor Kurtz provided her with any guidance as to how to meet this standard. *Id.* Ellsworth testified when he and Kurtz discussed the creation of the hybrid department and the compensation for its manager, they decided that because it was a new process, they should wait and evaluate it at the end of the year. (Ellsworth Dep. at 107). Kurtz testified when the Internet Department was integrated into the BDC room, Hausz asked to be paid more and he thought discussing compensation was premature because "we d[id]n't even know if this [wa]s going to work." (Kurtz Dep. at 133). He testified he said, "Let's get it off the ground first and then we will talk." *Id.*

Hausz believed she was being held to a higher and different standard than the male sales managers at Sunrise, so on September 24, 2002, she filed discrimination charges with the Equal Employment Opportunity Commission alleging Sunrise discriminated against her because of her sex. She filed similar charges in the EEOC against GMG on October 4, 2002. She received her notices to sue on September 25, and October 11, 2002, respectively, and filed the instant lawsuit based on the EEOC charges alleging wage discrimination and failure to promote. In response to Hausz's complaints, Sunrise and GMG allegedly retaliated against Hausz in several ways, including questioning her work performance based on false accusations, issuing discipline based on an inconsistent application of Sunrise's absence policy, and disparaging her character in the presence of other employees. On December 20, 2002, Hausz resigned from her position at Sunrise. Hausz contends she was constructively discharged as a result of the retaliatory conduct of Kurtz and Ellsworth. On February 13, 2003, Hausz amended her EEOC charge and complaint to add retaliation and constructive discharge claims.

5

## III.  ANALYSIS

### A.  Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). Once the moving party has met this burden of production, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

### B.  Equal Pay Act

Hausz claims that Defendants violated the EPA by paying her less than male sales managers for performing allegedly similar duties.[3] To establish a prima facie case of wage discrimination under the EPA, Hausz must demonstrate that (1) the employer paid higher wages to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibility, and (3) the employees worked under similar working conditions. *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 698 (7th Cir. 2003) (quoting *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998)). To succeed, Hausz must

---

[3] Hausz does not compare herself to any specific male employee. Apparently, Hausz is comparing herself to the other employees who received a percentage of the variable managers' compensation pool, who, in 2002, were all males. Those included in the pool were: Chris Conforti, new car sales manager; Joe Addante, used car sales manager; Tim Devaney, assistant new car sales manager; Manny Floyd, assistant used car sales manager; and Dan Schomer, sales manager.

"show that the jobs compared are substantially equal, based upon actual job performance and content – not job titles, classifications or descriptions." *Markel v. Regents of the Univ. of Wisconsin*, 276 F.3d 906, 912 (7th Cir. 2002) (citations and quotation marks omitted). Hausz need not prove that the work is identical. *See Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989). Rather, the two jobs at issue must have a "common core" of tasks that make a "significant portion" of those jobs identical. *Id.* (citation omitted). If the plaintiff sets forth this "common core," the court must ask "whether any additional tasks make the jobs substantially different." *Id.* (citation and quotation marks omitted). No intent to discriminate need be demonstrated under the Equal Pay Act. *Id.* at 1213.

It is undisputed that the first element is established in this case.[4] The parties agree that in January 2002, when Hausz was promoted to BDC Manager, General Manager O'Brien agreed to a new pay plan for Hausz that assigned her 12.5% of the variable managers' compensation pool. Hausz later discovered that her percentage of the pool was lower than the percentages of the other variable managers, all of whom were males.[5] For example, the assistant new and used car sales managers each were assigned 16% of the pool and the new cars sales manager was assigned 28.33% of the pool in 2002. From the time Hausz became BDC Manager in January 2002, until her resignation in December 2002, Hausz's percentage of the pool remained at 12.5%.

Hausz still must establish that she was paid less for equal work. The parties vigorously contest whether Hausz ever was considered a "sales manager" in 2002. There is no doubt she was promoted in

---

[4] In her memorandum opposing summary judgment, Hausz did not address the third element of a prima facie case: similar working conditions.

[5] Hausz contends that her percentage was "outside" of the 100% shared by the other managers and thus, none of the sales managers had their shares modified based on her inclusion in the pool. Defendants admit that, at times, the sum of the variable managers' percentages exceeded 100%, but the only effect it had was to reduce the overall profit of the dealership, not the actual payout to the variable managers. Hausz has cited no evidence that this practice had any effect on her (or any other variable manager's) actual pay.

January, 2002, to be the BDC Manager and was included in a compensation pool with sales managers. Hausz admits she was not a sales manager until the creation of the hybrid department in September, 2002. (Hausz Dep. at 109). Hausz also testified that she was specifically told she would have the title of "sales manager" by General Manager Kurtz when she was chosen to lead the hybrid department. Defendants deny she was ever told she was a sales manager or considered to be a sales manager, and that from the time she was hired as BDC Manager until her resignation she was always considered the BDC Manager.

Job content, and not job title alone should govern the inquiry of whether equal work was performed. *See Markel*, 276 F.3d at 912. The EPA sets forth three separate elements of equal work each which must be met to establish a prima facie case: skill, effort, and responsibility. *Cullen*, 338 F.3d at 698 (citing 29 U.S.C. § 206(d)(1)). Hausz contends her management responsibilities exceeded other sales managers because she ordered inventory, created marketing plans, and conducted monthly performance reviews. Hausz argues she performed duties similar to those of sales managers such as "dealing with customers and negotiating prices" and performed extra duties that sales managers were not required to perform such as being the only manager responsible for monitoring all incoming phone calls.

But it is also undisputed that Hausz managed the BDC, an internal division of the dealership, and was not structuring deals, closing deals,[6] ordering vehicles, appraising vehicles, and was not on the showroom floor interacting with customers as a sales manager would. She admits she did not have direct responsibility for negotiating with customers. Rather, as manager of the BDC, she was responsible for fielding customer calls, scheduling and confirming customer appointments, ordering

---

[6] According to former General Manager O'Brien, a "customer closing" involves a manager being brought into a deal to persuade a customer to commit to a purchase when a salesperson is unable to do so. (O'Brien Dep. at 45).

8

computer software, and training and supervising staff that fielded incoming calls. In her attempt to demonstrate the similarities between the responsibilities of the BDC Manager and those of sales managers, Hausz submitted a chart of her responsibilities as compared to sales managers. While she is able to list duties that she considers comparable to those of the sales managers, the chart illustrates how different her role in the dealership was from that of sales managers. For example, she argues that she, like a sales manager, was responsible for "inventorying." But the sales managers are responsible for ordering vehicle inventory,[7] whereas she was responsible for ordering sales documents such as source sheets, incentive boards, supplies, and equipment. (Pl. L.R. 56.1 ¶ 185). While sales managers are responsible for attending auto auctions, Hausz points out she "participated in various activities to support community relations." *Id.* It is undisputed that Hausz had many responsibilities that were not held by sales managers, but that was because she managed the BDC. Hausz was located inside the BDC room which was situated in the center of the dealership. She and her staff worked from within this room fielding and placing calls to customers. Finally, as BDC Manager, Hausz admits she had a different schedule than any other variable manager.[8] Given the above, Hausz is not able to demonstrate that the BDC Manager and Sunrise sales managers performed a common core of tasks.

When the BDC merged with the Internet Department to create the hybrid department, Hausz contends she was told she would be a sales manager by Kurtz. She testified she changed her work schedule to mirror those of the sales managers and worked similar hours as the assistant sales managers. She admits she did not have the responsibility of desking deals with customers but "she performed extra work the sales managers were not doing, such as monitoring Who's Calling, tracking phone calls, and

---

[7] At Sunrise, the in-store new and used vehicle inventory to be managed was worth over $11.5 million. (Def. L.R. 56.1 ¶ 38).

[8] Hausz admits "she did not want to work nights and weekends based on her role as a BDC Manager." (Pl. Response to Def. L.R. 56.1 ¶ 35).

tracking advertising." (Pl. L.R. 56.1 ¶ 182).[9] The chart Hausz submitted in her statement of additional

facts compares her responsibilities as BDC Manager to those of sales managers as well as compares her

work as BDC Manager to her own responsibilities as a sales manager in charge of the hybrid department.

The chart reveals that her new duties as manager of the hybrid department were similar to her previous

responsibilities as BDC Manager. The additional responsibilities she had as sales manager, according

to Hausz's chart, were that she now had Internet-related duties and she now "participated in working

deals with customers when necessary, supervised a team of salespersons who made deals with

customers." (Pl. L.R. 56.1 ¶ 185(c)). Defendants counter that the creation of the hybrid department did

not materially change Hausz's duties even though it added to her responsibilities the task of overseeing

Internet inquiries. Even assuming Hausz did deal and negotiate prices with customers *when necessary*,

the evidence Hausz submitted demonstrates that her core responsibilities were different from any of the

male sales managers to whom she has compared herself. Sales managers were working the showroom

floor, attempting to sell vehicles to customers who come to the store. Sales managers were interacting

face-to-face with customers on a constant basis and they were desking deals. Hausz admits while she

"may not have had much face-to-face customer contact, she spoke with numerous customers on the

phone in her role as BDC Manager and in her subsequent position as sales manager." (Pl. L.R. 56.1 ¶

161). She also admits "[s]pecific head sales managers were assigned the responsibilities of appraisal,

---

[9] When asked what additional responsibilities she took on as hybrid department manager besides changing her schedule she answered, "I was responsible for developing a team. . . . I had four salespeople and two assistants. I was responsible for their one-on-ones, for their goal setting for the month. I was responsible for paying out bonuses to the two assistants. I was responsible for confirming appointments first for the team and then for the rest of the store. I was responsible for analyzing our advertising. I was responsible for maintaining our incoming calls. I was responsible for communicating to the other managers of what salespeople need help with their phone skills. . . . I maintained and controlled pricing for our Internet, basically uploading it to one site. I reestablished Internet vendor relations that I had established . . . Accountability and reporting for internet leads coming in versus sold, percentage of closing on Internet leads. Basically, I took over all of the responsibilities that Chris Lucarelli had as an Internet sales manager." (Pl. Dep. at 76-78).

acquisition, reconditioning, and dispositioning of vehicle inventory" and she was "responsible for the inventory of all leads generated from phone calls and the Internet." (*Id.* ¶¶ 183-84). Hausz's own deposition testimony and the chart she provided in her statement of material facts demonstrates that Hausz's job was substantially different from the jobs performed by sales managers at Sunrise. As such, Hausz has failed to meet the second element of a prima facie case under the EPA.

### C.    Title VII

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against any employee for opposing an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a). A plaintiff may establish a Title VII claim either by offering direct proof of sex-based discrimination or retaliation, or by presenting evidence indirectly under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995). In Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Hausz proceeds solely under the indirect method. Therefore, the burden-shifting approach is the proper legal analysis for her Title VII claims.

The *McDonnell Douglas* analysis involves three steps. First, the plaintiff must establish a prima facie case of discrimination. *See* 411 U.S. at 802. If the plaintiff succeeds in doing so, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its action. *See id.* Finally, if the defendant meets this requirement, the burden shifts back to the plaintiff to present evidence that the reason provided by the defendant is pretextual. *See id.* at 804.

11

## 1.    Wage Discrimination

Hausz claims the disparity between the wages she received and the wages the sales managers received violates Title VII. In a wage discrimination claim under Title VII, a plaintiff must produce evidence that she was paid less than a similarly-situated male in order to establish a prima facie case. *See Johnson*, 70 F.3d at 478. Unlike the Equal Pay Act, under Title VII, Hausz must prove Defendants' intent to discriminate, that is, the pay disparity resulted from an "actual desire to pay women less than men because they are women." *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 704 n.8 (7th Cir. 2003) (quoting *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 525 (7th Cir. 1994)). Under Title VII, the plaintiff bears the burden of proof at all times to prove discriminatory intent. *Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989). If plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Id.*

Hausz cannot establish a prima facie case because she has not presented evidence of a similarly situated male that has been treated more favorably. As discussed above, the males in the variable managers' compensation pool are not similarly situated males. Moreover, Hausz has pointed to no evidence that would indicate Defendants treated her differently because of her sex. Even if Hausz was able to demonstrate that Sunrise paid her less than males for equal work, she would bear the burden of showing that Sunrise's reason for the wage disparity – relevant job experience of the employees and duties and responsibilities of each position – was pretextual. *See Johnson,* 70 F.3d at 478; *see, e.g., Ghosh v. Indiana Dep't of Envtl. Management*, 192 F.3d 1087, 1093 (7th Cir. 1999) (bypassing consideration of prima facie case and affirming entry of summary judgment for defendant where plaintiff failed to establish nondiscriminatory explanation was pretextual). Under Title VII, Defendants only have to meet a burden of *production* to proffer a justification, which we find they have. *See Fallon*, 882 F.2d at 1213. The burden of *persuasion* remains on Hausz to prove Defendants' explanation is a pretext

12

for discrimination. *Id.* Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005-06 (7th Cir. 2001) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n.*, 224 F.3d 681, 685 (7th Cir. 2000)). Hausz must specifically rebut Defendants' reasons, and must "include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). Even if the proffered reasons are mistaken or foolish, if Defendants honestly believed the reasons, no pretext has been shown. *Clay*, 253 F.3d at 1005-06.

In addition to Hausz's argument that she performed numerous tasks as a sales manager that other sales managers were not required to perform, Hausz presents two other arguments that allegedly indicate that the pay disparity was due to her sex rather than her relevant job experience or job duties: 1) Ellsworth falsely claimed that Hausz did not perform to his expectations and "[t]hese false accusations about Plaintiff's performance reveal an attempt to create false reasons for not compensating Plaintiff in an equitable manner"; and 2) Defendants did not provide her with a monthly guarantee. (Pl. Mem. at 10). Although Ellsworth did testify in his deposition that the BDC did not meet performance expectations established by Traver Technologies, an outside firm, Defendants have never stated that Hausz's performance as BDC Manager had any role in allocating her percentage of the pool in January 2002. To demonstrate that Ellsworth's testimony is false, Hausz simply points to the testimony of another employee, former General Manager O'Brien, who found Hausz to be "very capable." But O'Brien's assessment of Hausz does not demonstrate that Ellsworth was lying. Obviously, two people can differ in their assessments of an individual.[10] More importantly, Hausz does not suggest how

---

[10] When asked about an occasion in which Ellsworth questioned the productivity of the BDC in an email, Hausz testified she did not think Ellsworth was lying, but rather that she was upset that the "numbers were incorrect." (Pl. Dep. at 209). She also acknowledged that as COO, Ellsworth

Ellsworth's statement or belief affected her compensation in any way or how it evidences sex-based animus.

Additionally, Hausz has not demonstrated how the payment of a monthly guarantee to three of the sales managers demonstrates that Defendants' real reason for paying her less was because she was a female. First, Hausz herself received a guaranteed biweekly draw that assured her a set salary even when the profits that made up the compensation pool were low. Moreover, Hausz points to only three male sales managers who received a guarantee. In the end, Hausz has failed to introduce evidence that would permit an inference that the real reason she was paid less than sales managers was related to her gender, or that gender was even a motivating factor behind Defendants' allocation of the percentages in the pool. As such, Defendants are entitled to summary judgment on Hausz's wage discrimination claim.

### 2. Failure to Promote

To establish a prima facie case of failure to promote based on sex, Hausz must show that: (1) she is a member of a protected class; (2) she applied for and was qualified for an open position; (3) she was rejected; and (4) Sunrise filled the position with a person not in the protected class or the position remained open. *Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1005-6 (7th Cir. 2000).

Hausz contends Defendants refused to promote her to a position that would lead to her advancement, despite her strong management skills. Specifically, she argues Defendants discriminated against her by failing to promote her to a finance position. Even were we to assume that Hausz was qualified for a finance position, she fails to establish that she applied for an open position.

As an initial matter, it is undisputed that Hausz never formally applied for any open finance position. Rather, she indicated her interest in a finance position to Ellsworth in late 2001. It is

should definitely care about productivity. (*Id.* at 208).

undisputed that from late 2001 until Hausz's resignation in 2002, no primary finance positions became available. The parties agree that sometime in the summer of 2002, Hausz was offered, and subsequently rejected, an offer by Kurtz to fill a newly created position of finance assistant.[11] It is undisputed that in July, 2002, a secondary finance manager position opened and was filled by Kurtz with a male applicant. It is also undisputed that Kurtz never discussed that position with Hausz.[12]

Hausz contends that she is able to meet the second element of a prima facie case because all she is required to show is that she made an effort to convey her interest in the position. Hausz points to *Lederer v. Argonaut Ins. Co.*, as support for this proposition. No. 98 CV 3251, 1998 WL 126933 (N.D.Ill. Jan. 28, 2000). In *Lederer*, the court found that one of the plaintiffs had set forth sufficient facts from which a trier of fact could conclude that she made "every reasonable effort to convey an interest" in the position, thus excusing the need for a formal application. *Id.* at *5. The plaintiff in that case conveyed that interest by notifying the individual conducting the interviews for a foreign claims analyst position that she was interested in that position. *Id.* at *2. The interviewer told plaintiff that she could not apply for the position because the company wanted to hire a man. *Id.* Hausz also cites *Lust v. Sealy, Inc.* for the proposition that when an employer fills a position without notifying employees about the opening, the plaintiff need only establish that "had the employer approached her, she would have accepted the offered position." 243 F. Supp.2d 908, 915 (W.D. Wis. 2002). In *Lust*, the plaintiff specifically told her supervisor she was interested in the "key account manager" position. The court

<hr>

[11] The parties dispute what responsibilities the finance assistant position would entail: Hausz contends the position was administrative in nature, while Kurtz testified he intended the position to be more of a training position allowing for Hausz to fill in when managers were busy or absent.

[12] Although the finance director was fired in October 2002, thereby opening that position, Hausz admitted that she should not have been considered for the finance director position at Sunrise because she was not qualified. Indeed, the individual ultimately hired to fill the director position previously held the position of General Manager at a competing dealership and had spent six years as the finance director of another dealership.

explained that although plaintiff had not applied for the position, no one had, because there was no formal application process. The employer filled the position without notifying employees, taking applications, or interviewing candidates. Given that plaintiff wanted to be a "key account manager" and was willing to relocate, the court found it was reasonable to infer plaintiff would have taken the position, thus satisfying that element of a prima facie case. *Id.* at 915-916. Although neither of these cases required the plaintiff to have submitted a formal application, each of the plaintiffs specifically expressed interest in the position at issue in the case.

Defendants contend Hausz only expressed interest in a primary finance manager position. In fact, in her deposition, Hausz was specifically asked, "When you inquired about finance positions, were you talking about secondary finance positions or primary finance positions?" and she answered, "Primary." (Hausz Dep. at 147). Indeed, Hausz admits that "she was never denied a finance position that was open and about which she had inquired." (Def. L.R. 56.1 ¶ 60). While it may be proper to excuse the need for a formal application in certain circumstances, we find that Hausz has not set forth specific facts from which a trier of fact could reasonably conclude that Hausz made every reasonable effort to convey her interest in a secondary finance position. Thus, Hausz is unable to establish the second element of her prima facie case.

Hausz also offers circumstantial evidence purporting to demonstrate that Ellsworth and Kurtz generally refused to allowed her to advance at Sunrise despite her strong qualifications, which she contends indicates discriminatory intent.[13] As support, Hausz submits that in September 2002, Ellsworth, COO of GMG, told her she would "not be a good fit" for the finance position, despite positive

---

[13] Hausz contends in her complaint that male employees who received finance positions were less qualified than her for the positions. Hausz provides no evidence in support for this contention. Moreover, the employees who held primary finance positions were hired before Hausz expressed any interest in a finance position.

comments Ellsworth and other management previously made to her. Hausz admits Ellsworth never told her she would not be considered for the finance position if one opened in the future. Hausz also argues that Kurtz's decision to view Hausz in what she considered an administrative role, that of finance assistant, reveals discriminatory intent because he refused to recognize her abilities. But Hausz has not indicated how these actions impacted the conditions of her employment or her ability to advance at Sunrise. While Hausz had not yet been placed in a finance position by the time she resigned, it is undisputed that Hausz was promoted from marketing director to BDC Manager after one year of employment at Sunrise. It is also undisputed that six months later, Hausz was chosen over a male colleague to manage the hybrid department. Hausz also admits she was offered a sales manager position, which she declined because of the long hours it required. In sum, Hausz fails to establish a prima facie case of failure to promote.

### 3. Retaliatory Action

In order to establish a prima facie case of retaliation under Title VII, Hausz must show that: (1) she engaged in a statutorily protected activity; (2) she was performing her job satisfactorily at the time of the adverse employment action; (3) she suffered an adverse employment action; and (4) similarly situated employees who did not engage in statutorily protected activity were treated more favorably than Hausz. *See Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640, 643-44 (7th Cir. 2002).[14] Defendants concede Hausz engaged in a statutorily protected activity. Although Defendants do not admit Hausz was performing her job satisfactorily, they argue she is unable to meet the third and fourth elements of a prima facie case.

Hausz contends she has presented enough evidence to show that she was constructively

---

[14] A plaintiff may prove Title VII retaliation under two methods: the direct method and indirect method. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Hausz proceeds under the indirect method.

discharged due to the harassing actions of Ellsworth and Kurtz after the filing of her EEOC charges in September, 2002. Specifically, she alleges (1) Kurtz blamed Hausz for the resignation of three of the employees whom she supervised, broadcasting disparaging remarks to others; (2) Kurtz and Ellsworth criticized the performance of the BDC; (3) Kurtz issued a write-up to Hausz for taking an unapproved absence; and (4) her performance was constantly questioned based on inaccurate information. We fail to see how any of these events, even if each occurred as Hausz alleges, establish constructive discharge. Similarly, none of these events, alone, or taken together, rise to the level of an adverse employment action.

An adverse employment action is more than "mere unhappiness or inconvenience." *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). Rather, an employee at least must be able to show some quantitative or qualitative change in the terms and conditions of her employment. *Id.* Hausz contends she was written up for taking an unapproved absence and accused of not holding true to the company values in front of an office secretary. Even if Hausz did request and receive approval for her absence three days before the weekend, as she contends,[15] the issuance of a write-up still does not rise to the level of an adverse employment action. *See, e.g., Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999) (finding that a letter of concern or counseling alone is not an adverse employment action); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or negative performance evaluation, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (finding undeserved negative performance evaluations alone do not constitute adverse employment action). Hausz admits

---

[15] The parties disagree on the exact events leading up to her unexcused absence, but Hausz does admit she told Kurtz she was taking the upcoming weekend off because she had already purchased plane tickets. Kurtz contends he specifically did not approve her request to take off work Saturday because there were not enough managers scheduled to be working on that day. It is undisputed that Hausz did not show up for work on Saturday.

that the write-up imposed no disciplinary action on her, was not a demotion, did not affect her pay, her position title, or her responsibilities, and would not affect her opportunities, even though it could affect her employment record.

Hausz also contends Kurtz and Ellsworth criticized the performance of the BDC "without understanding the productivity and process of the department." (Pl. Mem. at 14). As support for this contention, Hausz contends Kurtz broadcast to others that he blamed her for the departure in late October, 2002, of three of the six employees she supervised. Hausz was not demoted, written-up, denied a bonus, or disciplined for the resignation of her employees. Again, unfair reprimands do not constitute an adverse employment action. *See Grube*, 257 F.3d at 725-26, 729-30 (finding that criticism of plaintiff's department by her manager in a supervisor's meeting did not constitute an adverse employment action in gender discrimination case).

Hausz then states that by December 19, 2002, her work environment "reached an unprecedented level" where she was constantly being questioned based on inaccurate information. (Pl. Mem. at 14). Hausz offers no support for this contention in her Memorandum in Opposition to Defendants' Motion for Summary Judgment.[16] Hausz's mere assertions, without more, are not enough to defeat summary judgment. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (noting that "[i]t is well-settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

---

[16] The only evidence we could find of what could be characterized as such is an email Hausz received from the COO of GMG, Ellsworth, dated December 19, 2002, that addressed what he considered the declining performance of the BDC managed by Hausz. (Def. Ex. R). He listed the number of incoming telephone calls and internet requests the BDC received as compared to the few actual sales that were completed and stated, "I would suggest getting together as a group and trying to identify the causes of this huge drop off and coming up with some plans to improve our effectiveness with these opportunities - TODAY!!. . . [i]t appears . . . that we are missing a lot of opportunities." *Id.*

Even taking all these events together, Hausz has not provided sufficient evidence to demonstrate

that she was constructively discharged. To establish constructive discharge, Hausz must show that her

working conditions were so intolerable that a reasonable person would be compelled to quit. *Chambers*

*v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1994). Here, a reasonable jury could not

conclude that Hausz's evidence, if believed, amounted to conditions so intolerable that a reasonable

person would have to resign. *See, e.g., Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001)

(finding shift transfer did not amount to a constructive discharge); *Harriston v. Chicago Tribune* Co.,

992 F.2d 697, 705 (7th Cir. 1993) (finding exclusion from office activities, being reprimanded without

reason, being given the least lucrative sales accounts, not being assigned new accounts, and other

allegations not sufficient to show plaintiff's working conditions were so onerous that she was compelled

to resign).[17]

Finally, while vigorously contesting whether any of the actions of which Hausz complains are

adverse, Defendants articulate legitimate, noninvidious reasons for each of the actions. First, Defendants

contend it was proper for Kurtz, as General Manager of Sunrise, to have an interest in retaining quality

employees and that a manager should be held accountable for retaining the employees he or she

supervises. While it may have been better for Kurtz to speak directly to Hausz about his concerns, rather

---

[17] Defendants also argue that Hausz does not establish a prima facie case of retaliation because she fails to demonstrate she was treated differently than a similarly situated employee. Hausz alleges that other employees were treated "more favorably than her." (Pl. Mem. at 15). With regard to Kurtz's questioning her about the departure of three of her staff, Hausz admits she had never lost that many employees in such a short period before, but contends that other managers were not held accountable for retention of their sales team members. Hausz points to no evidence to support this contention. She offers no evidence other than her own assertions that other employees who failed to give proper notice of their planned vacation were not issued a warning. Although in the past Hausz may have been able to give short notice of an upcoming vacation, the time at issue in this case was different because she was requesting to take the same day off as two managers who had already submitted their requests for time off to Kurtz. Again, Hausz's mere assertion that others were treated differently, without more, is not enough to defeat summary judgment. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002).

than blame Hausz in the company of others, as Hausz contends he did, even Hausz concedes that the General Manager should be concerned about the loss of three employees in her group. Second, Defendants posit that pursuant to company policy, Hausz was written up for failing to show up to work after Kurtz specifically told her she could not take time off that Saturday. Finally, Hausz fails even to address the issue of pretext in the context of her retaliation claim. In sum, because Hausz has failed to provide sufficient evidence from which a reasonable fact finder could conclude that she was subjected to retaliation for her lawsuit, we hold that Defendants are entitled to summary judgment on Hausz's retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, we deny Defendants' motion to strike and grant Defendants' motion for summary judgment. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated    12/1/03